UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| VERNON L. JOHNSON, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 4:11CV1235 HEA |
| | ) | |
| SSM HEALTHCARE SYSTEM, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment, [Doc. No. 33].  Plaintiff opposes the Motion. A hearing on the Motion was held on October 4, 2012, at which arguments were heard.  For the reasons set forth below, the Motion is granted.

## Introduction

Plaintiff brought this action in the Circuit Court of St. Louis County, Missouri, for injurious falsehood, Tortious interference with business and tortious interference with prospective advantage.  Defendant removed the action to this Court based on the Court's federal question jurisdiction set forth in 28 U.S.C. § 1331, in that Plaintiff's claims turn on the application of the Health Care Quality Improvement Act of 1986, which creates a presumption of immunity for peer review actions and related mandatory reports to a federal database.  See 42 U.S.C.

§§ 11101-11152.

## Facts and Background

Plaintiff is a physician who had medical staff privileges at Defendant's Hospital, DePaul Health Center in St. Louis, Missouri.  Plaintiff had been practicing as an OB/GYN medical doctor for approximately twenty-five years in the areas of St. Louis City and County at the time of the events giving rise to this action.

Pursuant to Missouri licensing law and regulations governing hospitals, DePaul is required to maintain a medical staff. Mo. Code Regs. tit. 19, § 30-20.086(1).  The medical staff is governed by "[hospital] bylaws, rules and policies" that, among other things, define the process for granting, revoking or restricting medical staff privileges.  DePaul had DePaul Health Center, Medical Staff Bylaws and Related Manuals in place at the time of the events surrounding this action.

Plaintiff initially became associated with DePaul on November 18, 1983 when he was granted Part-Time/Per Diem staff status.  Thereafter, Plaintiff was initially appointed as an active member of the Medical Staff in 1985 and then re-appointed to the Medical Staff on a periodic basis.   Each re-appointment period runs for two consecutive years and Plaintiff would have to seek re-appointment

- 2 -

upon the termination date of the re-appointment period.  Plaintiff agreed in his

DePaul re-appointment application form for privileges dated December 15, 2008

that he would be constrained by:

"[A]ny Hospital and Medical Staff policies and rules applicable generally and any

applicable to the particular situation. Any restriction on the clinical privileges

granted to me is waived in an emergency situation and in such situation my

actions are governed by the applicable section of the Medical Staff Bylaws or

related documents. In making this request I am bound by the applicable bylaws

or policies of [DePaul].

On April 21, 2009, DePaul re-appointed Plaintiff to the DePaul Active

Medical Staff in the Department of OB-GYN.  Plaintiff's term of reappointment

was for two years, from April 30, 2009 – April 30, 2011.

The Credentials Manual was part of the "Hospital and Medical Staff

policies" referenced in Plaintiff's re-appointment application form for privileges.

The Credentials Manual provides that: At any time the Health Center President,

the Medical Executive Committee or the Board has reason to question the

physical and/or mental health status of a [physician], the [physician] shall be

required to submit to an evaluation of physical and/or mental health status. Such

evaluations shall be performed by a physician or physicians acceptable to

[DePaul].

On December 1, 2009, staff members informed Patrice Komoroski, Ph.D., President of DePaul, about an incident involving Plaintiff and a DePaul patient's mother.  The mother had complained to DePaul's administration regarding the care received by Patient on at least four occasions during Patient's stay for delivery.  The mother rose from her chair, pointing her finger, and yelling. Plaintiff responded by asking the mother to  sit down, that Nurse Roop call hospital security, and third by distancing himself as far as possible from the mother.  The mother reported that Plaintiff was cursing, ranting and yelling.  The mother continued yelling, threatening Plaintiff's license and swearing that he would never practice medicine again. Nurse Roop left the room, and nurse Jackie Gary ("Nurse Gary") entered the room and stood next to Plaintiff as the mother continued to yell.

Nurse Galmore rushed into the room, pushed Dr. Johnson on his chest, and grabbed his arms.   Plaintiff grabbed Nurse Galmore's arm.  Plaintiff claims, for the first time in the summary judgment papers,  he was slipping and attempted to maintain his balance when he grasped Nurse Galmore's arm

No security report was filed regarding the Incident.

According to Nurse Gary, she had never before seen a visitor treat any

- 4 -

physician with such disrespect in her 16 year career.

Dr. Johnson avers that he continued to treat patients at DePaul for approximately six hours after the Incident.

Komoroski went to the Women's Services area of DePaul and spoke with the patient's mother about Plaintiff's behavior during the incident.  Komoroski also spoke to staff members who witnessed the incident.

Komoroski and the nurse then met with Dr. Andrew Karanas, Vice President of Medical Affairs, regarding the incident.  The nurse was sent to the Emergency Room because the nurse's arm was red.

Staff members informed  Komoroski and Karanas that they were afraid that Plaintiff and the patient's mother would get into a physical altercation. Staff members informed Komoroski and  Karanas that it had taken 3 staff members to get Plaintiff to leave the room.

The Credentials Manual allows for immediate precautionary suspensions by providing that: A precautionary suspension shall be initiated whenever a [physician]'s conduct would lead a reasonable person to believe that immediate action is necessary to prevent potential immediate danger to life, or substantial likelihood of injury to patients, employees or other persons present in [DePaul]. The precautionary suspension is an interim action and does not imply any final

responsibility for the situation which prompted the suspension.

Komoroski and Karanas decided there was a need for a precautionary suspension because they were concerned about the safety of patients and staff members. Komoroski also had concerns about his perception of Plaintiff's uncharacteristic behavior on the days preceding the incident.  On December 1, 2009, after the incident, Komoroski and Karanas implemented the initial precautionary suspension.

Around 8:30 p.m. that night, Karanas informed Plaintiff about the precautionary suspension of his privileges and hand delivered a letter addressed to Plaintiff regarding the precautionary suspension.   The December 1, 2009 Suspension Letter did not specify a time or date for the MEC meeting but only stated that a meeting would occur within five (5) business days.
Plaintiff avers that Dr. Karanas told him that it would be "improper" for Plaintiff to have any contact with any DePaul staff members regarding the Incident. Plaintiff immediately left the hospital as required.
Plaintiff did not receive any prior written notice from DePaul to attend the MEC meeting that took place on December 3, 2009.  Plaintiff was telephoned by Karanas and was advised that the  meeting would be on December 3, 2009 and that he was invited to attend at 4:15 p.m.  Plaintiff "believed" because of the

- 6 -

nature of the suspension that he was not permitted onto DePaul's premises without authorization.

The Notice of Precautionary Suspension informed Plaintiff that the precautionary suspension was an interim precautionary action, that he would be invited to attend to discuss the matter with the Medical Executive Committee ("MEC"), and that the MEC would be meeting to determine whether to continue, modify or terminate the precautionary suspension.

Plaintiff was informed of the December 3, 2009 MEC meeting.  Plaintiff did not attend the meeting.  Plaintiff submitted a letter which reflected his version of the incident.  Plaintiff's letter was read to the MEC during the December 3, 2009 meeting.  The MEC considered written statements from the witnesses to the incident. At its December 3, 2009 meeting, the MEC also interviewed Anitra Galmore regarding the incident involving Plaintiff. Anitra Galmore explained to the MEC that earlier on the incident date, she had informed  Karanas that Plaintiff was acting out of character because he wasn't as timely with patient care as he had been before.  Anitra Galmore specifically stated that Plaintiff was having issues with late rounding, and inductions being scheduled and canceled. Anitra Galmore then described how her arm was injured when she tried to redirect Plaintiff out of the patient's room. The MEC decided that the precautionary

- 7 -

suspension should be continued until Plaintiff could be evaluated by the Missouri Physicians Health Program ("MPHP") to determine whether Plaintiff had any circumstances in his life – possible burnout, psychological issue, or even drug or alcohol use – which would impose a risk to patients and staff.

The MEC discussed the incident and how Plaintiff's behavior was inappropriate and out of character by its characterization of Plaintiff's lashing out at a patient's mother and injuring a nurse.  The MEC decided that action was needed to ensure Plaintiff could work at DePaul without imposing a risk to patients and staff.

By letter dated December 4, 2009, DePaul informed Plaintiff that after the MEC considered all of the information available, the MEC decided to continue the precautionary suspension until an evaluation was completed by the MPHP. DePaul also informed Plaintiff about the determined need for a behavioral evaluation and that if his clinical privileges were suspended for more than thirty (30) days, DePaul would be obligated to make a report regarding the suspension to the National Practitioner Data Bank ("NPDB").  DePaul also informed Plaintiff that the MEC would need to receive the evaluation results in time for the MEC to make a final recommendation on Plaintiff's clinical privileges to the Board within thirty (30) days from the December 4, 2009 letter.

By letter dated December 3, 2009, The Keane Insurance Group, Inc. notified DePaul that Plaintiff's malpractice insurance coverage was terminated and listed the cancellation date as of November 23, 2009.

Over a month later, Plaintiff had not complied with the evaluation requirement and the MEC had a second meeting on January 12, 2010 to discuss the precautionary suspension.  At the second meeting, the MEC discussed how Plaintiff had made no contact with the MPHP.  Plaintiff, however, avers that he made contact with the MPHP.  It was also discussed how  Plaintiff had told Komoroski that he did not intend to be evaluated.  As a result of the Plaintiff's failure or refusal to undergo an evaluation, the MEC could not determine that Plaintiff did not pose a risk to DePaul patients and staff..

The MEC also considered that Plaintiff's malpractice insurance carrier notified DePaul that Plaintiff was no longer carrying insurance and that Plaintiff's medical license had been suspended by the State of Missouri.  The MEC discussed the situation and decided to recommend to the Board that Plaintiff's privileges be revoked, due to Plaintiff's refusal to be evaluated and that Plaintiff would have the right to request a hearing as outlined in the Bylaws.

By letter dated January 19, 2010, Dr. Thomas Charles, President of the Medical Staff, informed Plaintiff of the MEC's decision to recommend to

the Board that Plaintiff's Medical Staff membership and clinical privileges be revoked and of the right to request a hearing within thirty (30) days pursuant to Section 9.2.1 of the Credentials Manual.

Dr. Charles notified Plaintiff in the same letter of his right to have the hearing held before an ad hoc committee of five (5) physicians who were not in direct economic competition with Plaintiff, and that an attorney or member of the Professional Staff could accompany and advise Plaintiff at the hearing.

On January 19, 2010, because Plaintiff's suspension had continued for more than thirty (30) days, DePaul submitted a report ("Data Bank Report") to the NPDB pursuant to its obligation under the Health Care Quality Improvement Act of 1986 ("HCQIA"). In the Data Bank Report, DePaul reported that there was "an incident where staff reported that [Plaintiff] was raising his voice, gesticulating in anger and using foul language." DePaul also reported that "[w]hen a Health Center employee intervened in an effort to de-escalate the situation, Plaintiff physically grabbed the employee by the shoulders." DePaul also submitted a copy of the Data Bank Report to the Missouri Division of Professional Registration.

By letter dated January 27, 2010, Plaintiff requested a hearing by stating "I am requesting as granted in the Bylaws that a independent review and

- 10 -

recommendations be arranged."

By letter dated February 26, 2010, DePaul informed Plaintiff that since Plaintiff did not provide the names of three qualified independent psychologists to perform the requested evaluation, DePaul would proceed with the request for the hearing.

The letter stated:  At the hearing, both you [Plaintiff] and the MEC have the following hearing rights . . . to be accompanied by an attorney or a member of the Professional Staff who advises the relevant party but who may not make any statements on the record or ask any questions; to call, examine and cross-examine witnesses (in person or by teleconference); to present relevant evidence, including written evidence and statements; and to submit a written statement concerning any issue of procedure or of fact prior to, during, or at the close of the hearing.

The February 26, 2010 letter also informed Plaintiff: (1) "[if] you fail to appear at the hearing without good cause, you will be deemed to have irrevocably waived your right to a hearing/appellate review on this matter"; and (2) that the hearing would be transcribed by court reporter.  The February 26, 2010 letter stated that the hearing would be held on March 11, 2010 at 5:00 p.m. at DePaul; and provided the names of the six witnesses expected to testify on behalf of the

MEC. By letter dated March 2, 2010, Plaintiff confirmed that the date and time of the hearing and the composition of the hearing committee ("Hearing Committee") was acceptable.

Prior to the hearing, the MEC produced to Plaintiff the MEC's exhibits and witness list.

At the March 11, 2010 hearing, and pursuant to the Credentials Manual, Plaintiff was accompanied by his attorney, Denise Coleman.  At the hearing, Plaintiff gave an opening statement, cross-examined witnesses, used exhibits and gave a closing statement.  Dr. Karanas, acting on behalf of the MEC, also gave an opening statement, conducted direct examinations of witnesses, used exhibits and gave a closing statement. Members of the Hearing Committee also asked questions during the March 11, 2010 hearing.  The Hearing Committee heard from five witnesses concerning the incident and the suspension.

After the hearing, Plaintiff was provided with a copy of the hearing transcript.  Plaintiff and the MEC submitted their respective post-hearing closing memoranda which were considered by the Hearing Committee.

The Hearing Committee issued its recommendations in a report on April 23, 2010.  The Hearing Committee found that the incident on December 1, 2009 was significant and serious enough to warrant further investigation to determine

if Plaintiff had issues that would prevent him from safely practicing medicine at DePaul.   The Hearing Committee also found that the suspension on Plaintiff's privileges should be continued until Plaintiff was evaluated by a local psychologist/psychiatrist.

On April 26, 2010, the MEC met to consider the Hearing Committee findings and decided to continue the suspension.  By letter dated May 7, 2010, DePaul notified Plaintiff that the Hearing Committee recommended that the MEC take the following actions:  The precautionary suspension affirmed by the MEC on December 3, 2009 should be reinstated and continued until such time [] Plaintiff is evaluated by a local psychologist/psychiatrist.  [] Plaintiff is to provide the names of three local evaluators that are acceptable to him within fourteen (14) days of notification by the MEC of its recommendation. Thereafter, the MEC is to agree on one of the three evaluators within five (5) days, and [] Plaintiff is to undergo the evaluation within forty-five (45) days. Within five (5) days after completion of [] Plaintiff's evaluation, the MEC must meet to determine whether the precautionary suspension should be continued, modified, or terminated. Should [] Plaintiff fail to provide a list of evaluators within the timeframe set forth above, the MEC should proceed with revocation of [] Plaintiff's Medical Staff membership and clinical privileges.

- 13 -

In that same letter, Plaintiff was notified that the MEC substantially accepted the Hearing Committee's recommendations with the following modification:  The MEC will provide you with the names of three (3) evaluators it deems acceptable for your evaluation.  Within five (5) days of receipt of the list of evaluators, you must choose one evaluator that is acceptable to you.

DePaul provided Plaintiff with the names of the three evaluators to pick from for the evaluation.   DePaul notified Plaintiff in the same letter that failure to undergo an evaluation within forty-five (45) days of selecting an evaluator would result in revocation of privileges because the MEC would not be able to determine Plaintiff's qualifications as a member of the Medical Staff.   Plaintiff took issue with the evaluators because they were "associated" with the MPHP, despite the fact that the Hearing Committee found that referral to the MPHP was unwarranted.

As of June 14, 2010, over thirty days after being provided with the option of evaluators, Plaintiff had not selected the name of an evaluator or indicated that he would comply with the required evaluation.

The MEC met on June 14, 2010 and reinstated its recommendation to the Board that Plaintiff's Medical Staff membership and clinical privileges at DePaul be revoked.

By letter dated June 15, 2010, DePaul notified Plaintiff of his right of appeal under Section 9.4.1 of the Credentials Manual to have the Board determine whether the MEC's recommendation was supported by a preponderance of the evidence.  According to the Credentials Manual, the MEC gave Plaintiff ten days to submit a request for an appellate review by the Board.

As of July 9, 2010, Plaintiff had not exercised his right to an appellate review.  Komoroski submitted the MEC's recommendation to the Board for final action to be taken at the Board's July 26, 2010 meeting.  Komoroski submitted the following to the Board for review along with the MEC's recommendation to revoke privileges: (1) the MEC's and Plaintiff's exhibits that were presented at the peer review hearing; (2) the transcript of the peer review hearing, the MEC's and Plaintiff's post-hearing memoranda; (3) the MEC meeting minutes; (4) Plaintiff's failure to comply with the evaluation requirement; (5) Plaintiff's recent license suspension in the State of Missouri and the lapse in medical malpractice insurance.

Subsequently, on July 26, 2010, the Board concurred with the MEC's recommendation and made the final decision to revoke Plaintiff's Medical Staff membership and clinical privileges at DePaul.

By letter dated August 2, 2010, Komoroski notified Plaintiff of the Board's

final decision to revoke Plaintiff's Medical Staff membership and clinical

privileges and the reason for the decision by stating, "Due to your failure to

undergo a comprehensive behavioral evaluation, the MEC and the Board were

unable to determine your qualifications for Medical Staff Membership."

On August 4, 2010, DePaul submitted an update to the original Data Bank

Report of January 19, 2010 to reflect the Board's final decision to revoke

Plaintiff's Medical Staff membership and clinical privileges.

Plaintiff applied to New Mexico for a license and New Mexico requested

information from DePaul.  DePaul did not send any Data Bank Report or

information about Plaintiff's revoked privileges to the New Mexico Medical

Board because Plaintiff did not submit an Authorization For Release of

Information form to DePaul.

## Discussion

## Summary Judgment Standard

The standard for summary judgment is well settled.  In determining

whether summary judgment should issue, the Court must view the facts and

inferences from the facts in the light most favorable to the nonmoving party.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986); *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005).  The

moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Enter. Bank*, 92 F.3d at 747.  Once the moving party has met this burden, the nonmoving party may not rest on the allegations in his pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists.  Fed.R.Civ.P. 56(e); *Anderson* 477 U.S. at 256; *Krenik v. Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505 (1986)." *Hitt v. Harsco Corp.* 356 F.3d 920, 923 (8th Cir. 2004).  An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party" on the question. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248; *Woods v. DaimlerChrysler Corp.,* 409 F.3d at 990.  To survive a motion for summary judgment, the "nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.'  *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)(quotation omitted)." *Putman v. Unity Health*

*System*, 348 F.3d 732, 733-34 (8th Cir. 2003).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  The Court will review the facts in this case with the stated standard in mind.

### HCOIA Immunity

Immunity under the HCQIA is a question of law that may be resolved whenever the record is sufficiently developed. See, e.g., *Bryan v. James E. Holmes Regional Medical Center,* 33 F.3d 1318 (11th Cir.1994); *Meyer v. Sunrise Hosp*., 117 Nev. 313, 22 P.3d 1142 (2001).  "Congress passed the [HCQIA] 'to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior.' "  *Sugarbaker v. SSM Health Care,* 190 F.3d 905, 911 (8th Cir.1999); *see also,* H.R.Rep. No. 903, 99th Cong., 2d Sess. 2 (1986). Congress concluded that effective peer review would be furthered "by granting limited immunity from suits for money damages to participants in professional peer review actions."  *Sugarbaker,* at 911; *see also,* 42 U.S.C. §§ 11101(5), 11111(a).

The HCQIA defines the term "professional review action" to mean

an action or recommendation of a professional review body which is

taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges ... of the physician.

42 U.S.C. § 11151(9).

Under the HCQIA, in order for the actions to be granted immunity, the professional review action must be taken:

(1) in the reasonable belief that the action was in furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

*Sugarbaker,* at 912; *see also,* 42 U.S.C. § 11112(a).

The HCQIA further creates a presumption that a professional review action meets these standards "unless the presumption is rebutted by a preponderance of the evidence." *Sugarbaker,* at 912; *quoting, Wayne v. Genesis Med. Ctr.,* 140 F.3d 1145, 1148 (8th Cir.1998); *citing,* 42 U.S.C. § 11112(a).  Further, the requirements contained in section 11112(a) necessitate an objective inquiry.  *Id.*

A court, therefore,  must determine whether the physician satisfied his or

- 19 -

her burden of producing evidence that would allow a reasonable jury to conclude

that the hospital's peer review process failed to meet the standards of the HCQIA.

*Lee, supra.*   See, *Brader v. Allegheny General Hosp.,* 167 F.3d 832 (3d

Cir.1999); *Austin v. McNamara,* 979 F.2d 728 (9th Cir.1992).

Initially, the precautionary suspension of Plaintiff's privileges on the day of

the incident qualifies as a "professional review action."  The MEC is a

professional review body; its action was based on the professional conduct  of

Plaintiff; which affected Plaintiff's clinical privileges.  Plaintiff's attempt to

isolate the initial precautionary suspension is unavailing.  The Court is not

required to analyze each individual step of the review process, rather, the actions

as a whole are considered, and the ultimate decision form the basis of whether a

professional review action meets the criteria for HCQIA immunity.  See, *Meyers*

*v. Logan Memorial Hosp*., 82 F.Supp.2d 707, 713-14 (W.D. Ky 2000); *Eluhu v.*

*HCA Health Services of Tennessee, Inc.*, 2009 WL 3460370 (Tenn.Ct.App.

2009).

As to whether Defendant held a reasonable belief that its action furthered

quality health care, Defendant has established this element.  Karanas issued the

initial suspension after receiving reports of the incident involving a patient and

her mother.  The reports he received were from staff members who reported that

there was yelling coming from a patient's room; Plaintiff was yelling at the patient's mother; staff members attempted to calm Plaintiff; Plaintiff grabbed a nurse's arm causing redness.

Subsequently, the MEC conducted its investigation on December 3, 2009. It concluded that Plaintiff's behavior was "out of character" and needed to be evaluated.  After Plaintiff had not contactd the MPHP and refused an evaluation, the MEC could not determine Plaintiff's qualifications, and therefore recommended revocation of his privileges.

The Hearing Committee conducted a peer review hearing to review the MEC's recommendation.  The Committee found the incident to be significant and determined that Plaintiff should be evaluated.  Albeit, the Hearing Committee did not completely agree with the MEC's decision, it did recommend evaluation.

The objective inquiry the Court makes focuses on whether the professional action taken against Plaintiff was taken "in the reasonable belief that the action was in the furtherance of quality health care." *Sugarbaker,* at 913. Here, Plaintiff was advised of the MEC's meeting, but failed to appear.[1]  Plaintiff did, however, provide his verison of the events through a letter, and the MEC, based on the

---

[1] Although Plaintiff urges that he believed he could no longer be physically present on the hospital grounds, Plaintiff's "belief" is belied by the invitation to attend the meeting.

reports of yelling, cursing and physical acts led the MEC to the reasonable conclusion that suspending Plaintiff was in furtherance of quality health care.

Plaintiff expressed reluctance to comply with the conditions set forth by the Hearing Committee. Plaintiff advised that he would not participate in behavioral evaluation. The MEC provided Plaintiff with the identity of professionals from whom he could select an evaluator.  Plaintiff's failure to do so, resulted in Defendant terminating Plaintiff's staff privileges.

The record unequivocally evidences that concern for health care quality remained at the forefront throughout the peer review process.

Plaintiff attempts to rebut Defendant's action of revoking his privileges by arguing that the Hearing Committee's recommendation was different from that of the MEC, therefore, there was no objective reasonable basis for continuing the suspension. This argument is neither persuasive nor provocative because the Hearing Committee expressly agreed that the incident was significant and that there should be an evaluation.  As such, the Hearing Committee's recommendation did not vindicate plaintiff.

In sum, Plaintiff failed to produce sufficient relevant evidence to rebut the presumption that Defendants revoked his privileges in the reasonable belief that the action was in furtherance of health care quality.

In order to be immune from liability under HCQIA, it is also necessary for Defendant to make a reasonable effort to obtain the relevant facts. The "totality of the process" leading up to Defendant's action is looked at in assessing whether a reasonable effort was made to obtain the facts. *Sugarbaker,* at 914.  The  record supports Defendant's contention that it made very considerable reasonable efforts to obtain all relevant and pertinent facts.  Upon notification of the incident by the patient's mother and speaking with the patient's mother, Komoroski interviewed the two nurses who were present.  The nurses gave written statements about what happened.  The MEC interviewed Nurse Galmore.  It considered the written statement of Nurse Gruen.  The MEC attempted to hear Plaintiff's version in person, but Plaintiff failed to appear at the meeting.  The MEC did, however, consider Plaintiff's version of the events through his letter.

It is undisputed that the failure to provide Plaintiff with adequate notice and an opportunity to be heard would preclude immunity under the HCQIA. Plaintiff complains that Defendant's actions with respect to the initial suspension denied him adequate notice.  Plaintiff's position is eviscerated by his failure to appear at the meeting.

The HCQIA requires that the "professional review action" must be taken "after adequate notice and hearing procedures are afforded to the physician or

after such other procedures as are fair to the physician under the circumstances."

*Gabaldoni v. Washington County Hosp. Ass'n.,* 250 F.3d 255, 262 (4th Cir.2001).

A "professional review action" does not occur under the HCQIA until "an action

or recommendation of a professional review body [ ] is taken or made in the

context of a professional review activity....which affects (or may affect) adversely

the clinical privileges, or membership in a professional society, of the physician."

*Gabaldoni,* at 262; *quoting,* 42 U.S.C. § 11151(9).  The "professional review

action" complained of occurred when Defendant took action on March 11, 2010,

revoking the privileges of Plaintiff at DePaul Hospital. This action did not occur

until after the requisite notice and hearing procedures were followed. Plaintiff

was then represented by counsel at the Hearing.  At the hearing, Plaintiff gave an

opening statement, cross-examined witnesses, used exhibits and gave a closing

statement.  Dr. Karanas, acting on behalf of the MEC, also gave an opening

statement, conducted direct examinations of witnesses, used exhibits and gave a

closing statement. Members of the Hearing Committee also asked questions

during the March 11, 2010 hearing.  The Hearing Committee heard from five

witnesses concerning the incident and the suspension.

　　　After the hearing, Plaintiff was provided with a copy of the hearing

transcript.  Plaintiff and the MEC submitted their respective post-hearing closing

memoranda which were considered by the Hearing Committee.

Consequently, Plaintiff has failed to create an issue of material fact that he was not given the requisite notice and hearing procedures.

The final inquiry is whether defendants undertook the professional review action "in the reasonable belief that the action was warranted by the facts known after [a] reasonable effort to obtain facts" and after providing adequate notice and hearing.; which is a similar analysis to that taken under sec. 11112(a)(1). *Sugarbaker v. SSM Health Care.* 190 F.3d at 916.

It should be noted that the fact that the physicians involved in this process may have reached an incorrect conclusion on a particular medical issue because of a lack of understanding does not "meet the burden of contradicting the existence of a reasonable belief that they were furthering health care quality in participating in the peer review process." *Sugarbaker,* at 916.  Based on the record before the Court, there is no question of fact, and it remains clear that the peer review process was reasonable under HCQIA.  *Sugarbaker,* at 917; *see also, Misischia v. St. John's Mercy Med. Center,* 30 S.W.3d at 861.  Defendant was confronted with an incident told to administrators by a patient's mother regarding the behavior of her daughter's physician.  Yelling, cursing and physical actions were all involved.  Plaintiff refused to attend the meeting to discuss what had

occurred, and refused the recommended behavioral evaluation.  Plaintiff did not

participate in attempting to determine the underlying root of his actions with

respect to the patient's mother in the patient's room.  As such, the actions taken

by Defendant were based on a reasonable belief that the quality of care of the

patients at DePaul Hospital mandated revocation of Plaintiff's privileges.

## Conclusion

In conclusion, the Court finds that, in viewing the facts in the best light for

Plaintiff, a reasonable jury could not conclude that Plaintiff has shown that

Defendant's actions were outside the scope of the immunity provision. Therefore,

Defendant is immune from money damages under HCQIA.  Summary Judgment

is therefore warranted.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary

Judgment, [Doc. No. 33], is **GRANTED**.

A separate judgment is entered this same date.

Dated this 30th day of January, 2013.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE

- 26 -